Peter M. GARVIE, Plaintiff–Appellant,

v.

Charles O. JACKSON and George W. Wheeler, Defendants–Appellees.

No. 87–5569.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 23, 1988.

Decided April 27, 1988.

Cecil D. Meek, Jr. (argued), Haynes, Meek, Summers & Mabry, Knoxville, Tenn., for plaintiff-appellant.

Beauchamp E. Brogan, University of Tennessee, Catherine S. Mizell (argued), Knoxville, Tenn., for defendants-appellees.

Before KRUPANSKY and WELLFORD, Circuit Judges, and GILMORE *, District Judge.

WELLFORD, Circuit Judge.

In this case, plaintiff brought suit under 42 U.S.C. § 1983 against the Provost and the former Dean of the College of Liberal Arts at the University of Tennessee. Plaintiff asserts that his removal by defendants from his position as Head of the University's Speech and Theatre Department violated his rights under the first and fourteenth amendments of the Constitution. The district court granted defendants summary judgment based on its findings that defendants were entitled to qualified immunity and that plaintiff had adequate state postdeprivation remedies. We find that defendants' actions did not violate any of plaintiff's clearly established rights and therefore affirm the district court's judgment on the grounds of qualified immunity.[1]

Plaintiff Peter Garvie served as Head of the University of Tennessee's Department of Speech and Theatre from September 1, 1983, until his appointment as Head was terminated on June 30, 1986. During and following that time, Garvie also has been employed as a tenured professor in the Department. Several pieces of correspondence among Garvie and University administrators provide the only written evidence of the terms of Garvie's employment. The correspondence makes clear that Garvie's appointment was offered with the understanding that the administration would recommend that Garvie be granted tenure as a professor, but that the administrative assignment as Department Head carried no tenure. Garvie claims, however, that he was led to believe that he would serve as Head for an initial term of five years, during which term he could be removed only for cause. Garvie rests his claim on "oral explanations" and on the following language in a letter from Robert Landen, a former Dean of the College of Liberal Arts:

all department heads in the University serve at the pleasure of the Chancellor and, officially, administrative appointments are renewed on an annual basis; however, in the College of Liberal Arts it is expected that department heads will serve for five years at which point a "Leadership Needs Assessment" will be conducted under the auspices of the Dean of the College; this assessment will give all concerned, including you, a chance to reflect on whether or not you should continue serving as head of the department for another term; ...

In March 1986, Garvie presented several concerns to Provost Wheeler regarding Dean Jackson's actions relating to the Department of Speech and Theatre. Specifically, Garvie complained that Jackson, without Garvie's knowledge, had provided funds directly to a Forensics professor for use by the debate team and had improperly conducted administrative grievance reviews of departmental evaluations. At the same meeting, Garvie defended the Department's timely but controversial nonretention vote regarding a theatre faculty member.

Shortly following his meeting with Wheeler, Garvie met with Dean Jackson. Apparently, both Garvie and Jackson expressed anger at the other's actions: Jackson was angry about Garvie's complaints to Wheeler, and Garvie was angry about what he regarded as Jackson's interference in the Speech area of the Department.

During the latter part of March 1986, Dean Jackson and Provost Wheeler exchanged memoranda regarding the Department and Garvie. Jackson cited Department dissatisfaction with Garvie's handling of evaluation procedures and Garvie's threat "to cease administration of the department's speech wing." In response, Wheeler stated: "Professor Garvie *will* administer all aspects of the Department under guidelines and in a manner satisfactory

---

* The Honorable Horace W. Gilmore, United States District Court for the Eastern District of Michigan, sitting by designation.

1. Because we find that defendants are clearly entitled to qualified immunity, we need not consider the applicability to this case of *Hudson v.* *Palmer's* rule [468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)] regarding adequate state postdeprivation remedies, although we are disposed to believe the rule is applicable to the circumstances here.

to you. Any failure to administer the Department according to the duly established procedures of the College and the University will result in his dismissal as Head."

In early April 1986, Garvie filed with Jackson a Complaint and Request for Review regarding Jackson's handling of the previous year's evaluation grievances. Jackson responded to Garvie's complaint in a letter in which he clarified his actions in regard to those grievances and informed Garvie that further appeal could be taken pursuant to the University's *Faculty Handbook*. In conclusion, Jackson stated: "I wish sincerely that our working relationship was better than is currently the case. While I may have some misgivings about you as an administrator, clearly no one would or could deny the excellence of your work with the theatre." In late April and early May, Dean Jackson began discussing an appointment as Department Head with another professor, and in early May Jackson requested Garvie to resign his Headship, a request that Garvie denied. Jackson then informed Garvie that he would consult with the Department's faculty regarding the renewal of Garvie's appointment as Head. On June 9, 1986, Dean Jackson recommended to Provost Wheeler that Garvie's appointment not be renewed. On June 30, 1986, Wheeler informed Garvie that his appointment as Head would expire as of that date and would not be renewed. Garvie, however, would retain full-time faculty status as a Professor of Speech and Theatre.

Garvie filed a § 1983 action in district court alleging that his removal as Head was wrongful and maliciously made in violation of his first amendment rights and his fourteenth amendment property and liberty due process rights. Defendants answered and filed a motion for summary judgment on the grounds that they were entitled to qualified immunity. The court granted defendants' motion.

The doctrine of qualified immunity recognizes that government officials need to be able to carry out their duties without fear of harrassing litigation and that they can do so "only if they reasonably can antic-ipate when their conduct may give rise to liability for damages and only if unjustified lawsuits are quickly terminated." *Davis v. Scherer,* 468 U.S. 183, 195, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984). Therefore, when government officials perform discretionary functions, they "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The question of whether qualified immunity attaches to an official's actions is a purely legal question for the trial judge to determine prior to trial. *Donta v. Hooper,* 774 F.2d 716, 719 (6th Cir.1985), *cert. denied,* — U.S. —, 107 S.Ct. 3261, 97 L.Ed.2d 760 (1987); *see also Ramirez v. Webb,* 835 F.2d 1153, (6th Cir.1987); *Dominque v. Telb,* 831 F.2d 673 (6th Cir.1987). The district court decided as a matter of law that defendants were entitled to claim the defense of qualified immunity.

The focus in determining whether an official is entitled to qualified immunity is on the objective legal reasonableness of the official's actions in light of clearly established law. *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. An allegation of malice will not alone defeat an official's claim to immunity. *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). Instead, we must decide whether defendants reasonably could have thought that their actions were consistent with the rights that plaintiff claims have been violated. *Anderson v. Creighton,* — U.S. —, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). We should focus on whether, at the time defendants acted, the rights asserted were clearly established by decisions of the Supreme Court or the courts of this federal circuit. *Cf. Davis v. Scherer,* 468 U.S. at 192, 104 S.Ct. at 3018; *Davis v. Holly,* 835 F.2d 1175, 1182 (6th Cir.1987). "[Defendants] have qualified immunity unless plaintiffs' 'rights were so clearly established when the acts were committed that any officer in the defendant's position, measured objectively, would have clearly un-

derstood that he was under an affirmative duty to have refrained from such conduct.'" *Ramirez v. Webb*, 835 F.2d at 1156 (*quoting Dominque v. Telb*, 831 F.2d 673, 676 (6th Cir.1987)). It is not determinative that the plaintiff has asserted the violation of a broadly stated general right:

> [O]ur cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of preexisting law the unlawfulness must be apparent.

*Anderson*, 107 S.Ct. at 3039 (citation omitted); *see also Malley*, 475 U.S. at 341, 106 S.Ct. at 1096 (if officers of reasonable competence could disagree on an issue, immunity should be recognized). These principles would indicate that despite plaintiff's general assertions of constitutional violation, he must set out a particular and clearly established violation in order to prevail against a claim of qualified immunity.

▪ Garvie asserts that the matters he raised in meetings with Wheeler and Jackson touched on matters of public concern and, therefore, that his speech was protected by the first amendment. He further alleges that his removal as Department Head was in retaliation for his protected speech and thus was unlawful. In arguing against defendants' claim of qualified immunity, Garvie asserts that a reasonably competent public official would have known in 1986 that an alleged retaliatory termination of a department head based on the exercise of first amendment rights was unlawful. We believe that under the reasoning of *Anderson*, however, Garvie's argument presents too general a question. Instead, we consider whether reasonably competent officials could have disagreed on whether and to what extent Garvie's speech was protected by the first amendment.

*Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), makes clear that educators should be able to speak out freely on educational questions of *public* concern. In that case, the Court held that a teacher could not be dismissed in retaliation for a letter publicly criticizing the School Board's allocation of school funds and its methods of informing, or not informing, voting taxpayers of the reasons why additional tax revenues were being sought for a school system. The Court's professed goal was a "balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568, 88 S.Ct. at 1734. In reaching its conclusion, the Court considered both that Pickering's criticism was in no way directed toward any one with whom he personally worked on a daily basis and that the subject on which Pickering commented—the school system's need for additional funds—was a question determined by popular vote and obviously a matter of public concern and interest. *Id.* at 569–70, 571, 88 S.Ct. at 1735–36, 1736.

By contrast, *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), presented a case in which an employee's criticism of her superior threatened to undermine authority and morale in a government workplace. Myers, an Assistant District Attorney, was dismissed based on her refusal to accept a transfer and on insubordination in circulating an office questionnaire regarding various matters, including office morale and pressure to work in political campaigns. The Court first found that unless Myers' questionnaire fairly could be characterized as constituting speech on a matter of public concern, *i.e.*, "any matter of political, social, or other concern to the community," *id.* at 146, 103 S.Ct. at 1689, the reasons for her discharge were irrelevant for first amendment purposes. The focus in assessing the public nature of the speech rested on the speaker's motivation. "[W]hen a public employee speaks not as a citizen upon matters of public concern, but

instead as an employee upon matters only of personal interest," the first amendment ordinarily is not implicated. *Id.* at 147, 103 S.Ct. at 1690. Furthermore, although the Court found that Myers' question regarding pressure to work in political campaigns touched on a matter of public concern, the Court balanced Myers' interest against the state's interest and concluded: "The limited First Amendment interest involved here does not require that [the employer] tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships." *Id.* at 154, 103 S.Ct. at 1694.

*Pickering* and *Connick* establish that a public employer may not dismiss an employee based the employee's speech on matters that concern the public, rather than the personal interest of the speaker, unless the employer's interest in efficient operation outweighs the employee's interest in speaking freely. We find, however, that neither these cases nor any others to which Garvie has cited us clearly establish either (1) that a department head's criticism of his superior's actions regarding the allocation of funds within a department, review of faculty grievances, and departmental votes on faculty nonretention is a matter of public concern, or (2) even if such speech did touch on a matter of public concern, that the department head's interest outweighs the administrator's interest in maintaining authority and good working relationships. *Connick* made clear that not all criticisms directed at a public official "would plant the seed of a constitutional case." 461 U.S. at 149, 103 S.Ct. at 1691. The record shows that Garvie's criticisms more closely resembled an employee's complaints regarding his superior's actions and his own responsibilities as a Department Head than a citizen's speaking out on a matter of public decisionmaking. We find, therefore, that competent university administrators could reasonably have concluded that termination of Garvie's Headship did not violate any of his first amendment rights, and we therefore find defendants entitled to qualified immunity on the first amendment claim.

■ Garvie also claims that he had a property interest in his appointment as Department Head and that defendants' termination of his appointment without a hearing violated due process. The relevant inquiry for this court, in light of defendants' claim of qualified immunity, is whether Garvie's asserted property interest was clearly established. In so inquiring, we examine Tennessee law to determine whether Garvie had a legitimate claim of entitlement to his position as Department Head. *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976).

"The hallmark of property, ... is an individual entitlement grounded in state law, *which cannot be removed except 'for cause.'* " *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 430, 102 S.Ct. 1148, 1155, 71 L.Ed.2d 265 (1982) (emphasis supplied). Ordinarily, under Tennessee law a public employee has only those rights to continued employment that are granted by a tenure system. *See Bush v. Johnson,* 607 F.Supp. 96, 99 (E.D.Tenn.1985) (citing *Blackwell v. Quarterly County Court of Shelby County,* 622 S.W.2d 535, 539 (Tenn. 1981) (dicta)). The University of Tennessee's *Handbook of the Faculty* makes clear that no tenure system applies to department heads: "The headship, like all other administrative offices, carries no tenure. It is renewed at the discretion of the Dean, Vice Chancellor, and Chancellor, in consultations with the faculty." Similarly, the written correspondence regarding Garvie's appointment clearly does not support a finding that Garvie's Headship would be terminated only for cause. Instead, Landen's letter to Garvie states: "all department heads in the University serve at the pleasure of the Chancellor...."

Garvie also fails to provide evidence of any "oral explanations" by University administrators that would give rise to his legitimate entitlement to a five year term as Head. Tennessee courts will not recognize the existence of an implied contract "in the face of a declaration to the contrary by the party to be charged." *V.L Nicholson Co. v. Transcon Investment & Financial Ltd., Inc.,* 595 S.W.2d 474, 482 (Tenn. 1980).

In reviewing Tennessee law and the evidence of record in this case, we conclude that this case more nearly resembles *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (finding no property interest in nontenured state teacher's contract), than it does *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (finding property interest created by state college's *de facto* tenure policy). Accordingly, we conclude that reasonably competent university administrators could have decided that Garvie was removable, and thus had no property interest in his Headship. Defendants are entitled to qualified immunity on this claim also, since Garvie was reasonably believed to be subject to removal on a basis other than cause.

■ Garvie finally asserts that his removal as Department Head constituted a deprivation of a liberty interest under the fourteenth amendment. He claims that he was publicly defamed by the rumors that circulated in the Department regarding his removal and by Provost Wheeler's statement to a student newspaper that nonrenewal of Garvie's appointment was "in the best interests of the department."

*Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), held that no liberty interest was implicated when a state university failed to renew a teacher's one-year contract without explanation. The Court rejected the proposition that simply because the teacher's nonretention might make him less attractive to other employers, he had been deprived of liberty. *Id.* at 574 n. 13, 92 S.Ct. at 2707 n. 13. We have followed that line of reasoning:

> To be sure, plaintiffs lost their positions at the College, which may have made them less attractive to other employers, but in and of itself this does not amount to a deprivation of liberty. Plaintiffs have made no showing that a definite range of opportunities is no longer open to them, and accordingly their liberty has not been restricted within the meaning of *Roth*.

*Lake Michigan College Federation of Teachers v. Lake Michigan Community College*, 518 F.2d 1091, 1097–98 (6th Cir. 1975) (citation omitted), *cert. denied*, 427 U.S. 904, 96 S.Ct. 3189, 49 L.Ed.2d 1197 (1976).

Unlike the plaintiff in *Roth*, however, Garvie claims defamation in addition to removal as Department Head. It is not clear, however, that defamation unaccompanied by termination of employment or another change in Garvie's legal status constitutes a deprivation of liberty under the fourteenth amendment; an individual has no constitutionally protected interest in reputation alone. *See Paul v. Davis*, 424 U.S. 693, 709–10, 96 S.Ct. 1155, 1164–65, 47 L.Ed.2d 405 (1976). Garvie was terminated as Department Head, but continued to be employed by the University as a full-time, tenured professor at full salary. Garvie has made "no showing that a definite range of opportunities is no longer open" to him. *Lake Michigan College*, 518 F.2d at 1098. In light of these facts, we do not believe that defendants' alleged actions violated Garvie's *clearly established* fourteenth amendment right to liberty. Although official action is not necessarily protected by qualified immunity unless and until the very action in question has been held unlawful, *Anderson*, 107 S.Ct. at 3039, an official is not bound to anticipate correctly possible future extensions of the law if the question of law was open at the time he acted, *Mitchell v. Forsyth*, 472 U.S. 511, 535, 105 S.Ct. 2806, 2820, 86 L.Ed.2d 411 (1985).

In conclusion, we find that defendants Walker and Jackson reasonably could have concluded that their actions in terminating Garvie's appointment as Department Head did not violate Garvie's rights under the first and fourteenth amendments. Defendants therefore have carried their burden of pleading and proving the affirmative defense of qualified immunity. *See Alexander v. Alexander*, 706 F.2d 751, 754 (6th Cir.1983). We conclude that defendants were entitled to qualified immunity with respect to each of Garvie's claims and AF-

FIRM the district court's grant of summary judgment for defendants.